Sunshine Realty Corporation et al. }
vs.                          } Eq. No. 396
Arthur E. Bishop             }

May 15, 1928.

HAHN, J. Heard on bill, answer and proof.

Complainants pray for specific performance of an agreement, partly oral and partly in writing, for the sale of certain land described as lots 52, 53, 54, 55 and 57 on a "Plat of land in Pawtuxet, Town of Warwick, R. I., made for Luther P. Burlingame in 1890" (Complainants' Exhibit 1), the contention of the complainants being

that under a contract, whereby complainants were to pay respondent the sum of $2000 in monthly payments of $10 each, which they have been ready and willing to perform and some of which payments have been made, the respondent agreed to convey to the Sunshine Realty Co., a Rhode Island corporation and one of the complainants, the above mentioned lots. The transactions between the complainant Lewis Potemkin for himself and for Louise Gravon and for the Sunshine Realty Company and the respondent show that the complainant Potemkin and respondent were neighbors and on exceedingly friendly terms, the transactions, because of this fact, being carried out with a lack of formality, each trusting to the other to live up to the contract as he understood it. So far as appears all of the discussions and dealings were between the complainant Potemkin and the respondent. Some time before the question at issue in the present case arose, the respondent agreed to sell to Louise Gravon, having contracted with the complainant, five lots of land on the above mentioned plat, being lots 58, 59, 61, 62 and 63, for the sum of $2000 by the payment of $125 down and the balance in payments of $15 per month, the agreement in relation to this sale being marked Complainants' Exhibit 2. Thereafterwards, the complainant having paid in money and personal property about $275 on account of these lots decided that he would like to build a house across the street from these lots on lot 56 on said plat and he bought and paid for said lot 56, the amount being $550, $275 of which was represented by the aforesaid payments and the balance was paid at about the time of the purchase. Complainant testified that at or about said time, he decided that so long as he was going to build on lot 56, that he would prefer that he should own various lots adjoining lot 56 and not the aforesaid

lots which were across the street from lot 56, so that he (Potemkin) and the respondent agreed that the respondent should sell to him (Potemkin) or the Sunshine Realty Co., which was a corporation formed or to be formed by Potemkin for the purpose of taking title, lots 52, 53, 54, 55 and 57 on said plat, said lots immediately adjoining lot 56 hereinbefore referred to, and said Potemkin gave to the respondent a contract to build a house on lot 56. Subsequently it became necessary in building said house and the garage attached thereto, to use lot 55, so that the house and garage, as erected today by the respondent, cover a portion of lots 55 and 56. According to the respondent's contention, complainant agreed to purchase all of the lots from 36 to 57 exclusive of lot 56, already owned by complainant, but that no price had been agreed upon for the same nor had any terms of payment been agreed upon, although respondent admits that $80 was paid by complainant on account of the lots 36 to 57 inclusive, without any arrangement as to the terms of sale or the full price for all of said lots.

A check dated April 5, 1926, Complainants' Exhibits 6, for $10; a receipt dated October 20, 1926, for $50, stated to be on block of lots 52 to 57; a check for $10, stating on the back of it that it is payment on lots 52, 53, 54, 55 and 57, being one of the checks in Complainants' Exhibit 7; a check dated June 28, 1926, being part of Exhibit 7, $10. There is a further check for $50 dated May 3, 1926, (a part of Exhibit 7), which complainant says was on account of the lots 52 &c., but which respondent says was for the purchase of an automobile.

It also appeared in evidence that complainant had taken possession of all of the lots from 52 to 57 and had had respondent plant trees upon a number of them, had fences built and erected chicken houses on some of the lots, and so far as appeared had been in possession for some time. Complainant says that he has been ready and willing to make the $10 payments as called for by the contract as he views it, but that respondent would not receive them.

The check for $50 dated May 3, 1928, respondent alleges was received on account of an automobile which was purchased from complainant by respondent for the sum of $50, and so far as the evidence is concerned it appears that this check has no notation that it is on account of the lots as appears on the other checks which complainant says were paid upon account of the lots, and the weight of the evidence seems to be that this check was not paid upon account of the lots and should not be credited against the purchase price of the same. As to the three checks and receipt, amounting to $80, there is no doubt but that these were paid on account of the purchase price of lots 52 to 57 as stated by Potemkin and that respondent refused to accept further payment on account of the same.

In addition to the testimony of the complainant Potemkin, there is also that of Norman C. Walstead, who recalled a conversation which took place at complainant Potemkin's home on April 4th, at which he stated in a general way he, complainant and respondent were present, and that the conversation had to do with a transfer of land owned on the other side of the street and of the land across the street from witness' house. Four or five lots were in the discussion. He stated that the general discussion had to do with the transferring from one section to another; that the writing was on a piece of paper something the size of a check; that the respondent was reading off the numbers from a plat or blue print and the complainant was writing them down. This confirms the testimony of the complainant Potemkin

that the discussion being had April 4th, which was Sunday, the check was dated April 5th and that thereafterwards he took possession of the lots and occupied them as owner.

Q. You took possession of those lots 52, 53, 54, 55 and 57?

A. Immediately.

Q. What do you mean by immediately? What date?

A. Well, the week after that, after April 5th.

Q. What did you do in taking possession?

A. I have fenced it in, ploughed the ground and set out an orchard.

Q. Have you occupied those lots since April 1926?

A. Right.

Q. Without any objection on his (respondent's) part?

A. No objection.

And thereafterwards he referred to the dispute between himself and the respondent.

A careful consideration of the evidence in the case leads to the obvious conclusion that the complainant, Potemkin (who alone had dealings with the respondent) and the respondent were neighbors and friends; that the respondent owned land on the above described plat and was also a builder; that they carried out their transactions in an exceedingly informal manner, each relying upon the other to keep his word. The weight of the evidence would be that regardless of how friendly they were, that they would not have contracted for any lots without the price and method of payment being agreed upon, and, according to the complainant's story, as confirmed to an extent by the witness Walstead, such agreement was made. In short, that lots 52 to 57 exclusive of lot 56 were to be sold by respondent to complainant for the sum of $2000 to replace lots across the street formerly owned by the respondent and sold to Louise Gravon for complainant by the written instrument hereinbefore referred to. The contention of the respondent that complainant bought, or agreed to buy lots 36 to 57 inclusive, excluding lot 56, is so absolutely unbusinesslike that it is difficult to believe that such was the fact. No terms of payment were suggested, no prices were agreed upon, and when the Court considers the fact that complainant built his house and garage partly on lot 55, the respondent's contention becomes even less believable.

The only question, therefore, this Court finding that the contract was for the purchase of lots 52 to 57 exclusive of lot 56, is: Can a court of equity decree specific performance of a contract so indefinite in its terms so far as writing is concerned, but aided by the payments on account of the lots, the taking possession, fencing lots in, building upon one of them (lot 55) and performing all acts of ownership?

Whether a check, indorsed by vendor and referring briefly to the contract or to the property but not containing the essential terms of the contract, is sufficient to take the case out of the statute of frauds, is a question upon which the authorities do not agree.

20 A. L. R. 363 (Annotation).

In this state the general rule regarding the sufficiency of a memorandum is given as follows:—

"The note or memorandum sufficient to prevent the operation of the statute upon a contract for the sale of land need not have the formal precision usually found in a written contract or agreement. Such note or memorandum meets the requirements of the statute if it sets out who are the seller and the buyer, their respective intention to sell and to purchase, such a description of the subject matter of the sale as may be applied to a particular piece of land, the purchase price, and the terms of payment if the sale is not for cash;

and further such note or memorandum must be signed by the party to be charged in the action or by his agent lawfully authorized."

Sholovitz vs. Noorigian, 42 R. I. 282, 285.

The memorandum in the present case consists simply of the check, or checks, with the words "in payment on Lots 52, 53, 54, 55 and 57," written on the back, and indorsed by respondent. Such a memorandum by itself appears too indefinite, under the above rule, to take the case out of the statute. It does not set forth the purchase price or the terms of payment and the reference to the land is not very definite. It gives the numbers of the lots but not the block or plat etc.

The other features of this case, however, appear sufficient to warrant specific performance. Complainant took possession, had a house built (respondent, himself, doing the building) on part of the land, had trees planted, a fence built around the lots, and generally exercised dominion over and use of the property consistent with ownership or a right of ownership. In such cases specific performance is granted.

"Courts of equity sometimes grant relief on the ground of estoppel and part performance * * * for example. A. orally agrees to sell a house (lot?) to B. for a stipulated sum and B. relying upon the oral contract, with full knowledge of A., enters upon the land and erects a house, whereupon A. changing his mind decides not to give B. a deed. In such case it is clear that a court of equity would decree specific performance notwithstanding the statute of frauds. A. knowing that B. was relying upon the oral contract permitted B. to expend his time and money in constructing a house on A.'s lot. A. would be estopped to set up the statute of frauds thereby preventing proof of the contract because such conduct would be fraudu-

lent. The case would be lifted out of the statute of frauds. His conduct is an admission that a contract existed between the parties. * * * The house is visible and tangible evidence that the parties have entered into a contract. The court will inquire into its terms and compel the vendor to comply with his part of the oral agreement."

Ham vs. Massasoit Real Estate Co., 42 R. I. 293, 296.

If the memorandum or check be considered in conjunction with this feature of the case complainant appears entitled to specific performance. Respondent states no price was agreed upon but it is unreasonable to suppose that he would have allowed complainant to build on the property, respondent himself doing the work, unless he had agreed to sell the property and had come to an understanding as to a price for the land. It seems more likely that everything was mutually understood and agreed upon in a general way prior to the building of the house and that the construction of the house and garage gave rise to some dispute or misunderstanding aside from prior transactions and that such dispute caused unwillingness on the part of the respondent to fulfil his contract to sell the land in question.

The case appears to fall within the following rule:

"A careful study of the record satisfies us that complainant's possession * * * was understood by all parties to be pursuant to the oral contract of sale; that complainant under the new possession made valuable improvements and expended labor on said premises and that respondents received and have kept $500 on account of the purchase price. These combined acts of part performance sufficed to overcome the objection of the Statute of Frauds."

Najarian vs. Boyajian, 48 R. I. 213, 215.

According to the above authorities, in conjunction with the findings made by this Court, the complainant is entitled to a decree for specific performance.

The prayer of the bill for a conveyance of lots 52 to 57, inclusive, exclusive of lot 56, is granted, and complainant Potemkin having in open court expressed his willingness to pay the balance of the purchase price in cash, the decree may be conditioned upon the payment of $1920 in cash and delivery of a sufficient deed of said lots within 40 days after the entry thereof, and if appellate proceedings be taken, then at such time as may be set by the Supreme Court in the event that this decree is affirmed.

For complainants: J. J. McCabe.
For respondent: Cooney & Cooney.